(Nos. 67290, 67443 cons.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. DENNIS HOLVECK, Appellee.

*Opinion filed November 21, 1990.—Rehearing denied February 4, 1991.*

STAMOS, J., took no part.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, Cecil A. Partee and Jack O'Malley, State's Attorneys, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Inge Fryklund, Judy L. Groeneveld and Renee Goldfarb, Assistant State's Attorneys, and Marie Quinlivan Czech, Special Assistant State's Attorney, of counsel), for the People.

Randolph N. Stone, Public Defender, of Chicago (Z. Peter Tokatlian, Assistant Public Defender, of counsel), for appellee.

Dennis G. Holveck, of Pontiac, appellee *pro se.*

JUSTICE WARD delivered the opinion of the court:

The motion of the defendant, Dennis Holveck, to quash his arrest and to suppress evidence arising from two separate incidents of sexual assault on minors was denied by the trial court in the circuit court of Cook County. The appellate court reversed and remanded for a new trial. (171 Ill. App. 3d 38, 54.) We granted the State's petition for leave to appeal (107 Ill. 2d R. 315) and now affirm the judgment of the appellate court.

The defendant, Dennis Holveck, was charged with and found guilty on two counts of deviate sexual assault (Ill. Rev. Stat. 1981, ch. 38, par. 11—3(a)), two counts of aggravated indecent liberties with a child (Ill. Rev. Stat. 1981, ch. 38, par. 11—4.1(b)(1)(B)), and two counts of unlawful restraint (Ill. Rev. Stat. 1981, ch. 38, par. 10—3).

The charges stem from two separate incidents. The first incident (Docket No. 67443) occurred on November 1, 1983, in Streamwood, Illinois, and involved a five-year-old boy, M.S. On that day, while M.S. was walking home from kindergarten, a man in a car called to him and told him, "Come here, I have to show you something." Once M.S. reached the car, he noticed that the man's pants were unzipped and that the man was exposed. The man told M.S. that M.S. could not go home unless he placed his mouth on the man's penis. When M.S. tried to get away, the man grabbed the boy's hood. Eventually, M.S. got away from the man, ran home, and told his mother what happened. M.S. described the man as having a moustache and curly brown hair, but he could not describe the car or estimate the man's age in relation to his father.

The second incident (Docket No. 67290) occurred on November 16, 1983, in Barrington, Illinois, and involved three five-year-old girls: J.L., J.W., and J.B. On that day, the three girls were walking to kindergarten when a man in a car asked the girls if they wanted a ride. The three girls got into the man's car. At this time, J.B. noticed that the man's pants were unzipped. While the car was in motion, the man shouted that, if they wanted to get out of the car, they would have to fondle his genitals. J.W. testified that she saw J.B. touch the man's penis and saw J.L. put her hand and mouth on it. When the man released the girls, J.L. spit "stuff" out of her mouth.

On November 18, 1983, the defendant's car was stopped by a Streamwood police officer, Officer Robert Buschbacher. At roll call, the officers had been instructed to be on the lookout for a gray car with a specific license number "that had been seen acting suspiciously" in connection with an investigation involving an unidentified person who had picked up children. They

had been instructed not to make an arrest but simply to stop the car. Officer Buschbacher first noticed a parked car fitting the description. Officer Buschbacher saw two men get into the car. After the car pulled away, Officer Buschbacher stopped the car though the officer testified that the driver, the defendant, was not then breaking any laws, nor was there any cause to arrest him. The officer pulled behind the defendant's car, and a second police car, flashing its Mars lights, pulled up. The defendant got out of his car while two uniformed police officers walked toward him. The defendant testified that the police asked him for his driver's license, which he gave to the officer. Upon reaching the defendant, one of the officers asked the defendant if he would go to the police station to help get "a matter cleared up." The defendant answered, "Sure." No other questioning occurred. The defendant was not told that he did not have to accompany the officers to the station, that he could come to the station at a later time, or that he was under arrest. The defendant testified that he did not feel free to leave because, when he extended his hand to retrieve his license from the officer, the officer told him that he could pick it up at the station. The officers returned to their cars while the defendant got back into his own car. As the defendant drove his car to the police station, one police car preceded him; the second car remained behind him. The three cars rode to the police station in this order.

Upon arrival at the police station, the defendant was directed to park his car in a parking space. According to the defendant, one of the officers parked a police car at the entrance to the driveway, thus blocking the defendant's exit. The defendant got out of his car and walked into the station while his companion remained in the car. The testimony conflicts as to whether the defendant was led into the police station or was followed by Officer

Buschbacher. In either case, the officer directed the defendant to a small room where the defendant was under observation by one of the officers who stood by the door. The defendant testified that he did not feel free to leave and was not told that he could leave. The defendant, however, was not told that he was under arrest, was not touched by an officer, was not handcuffed, fingerprinted, searched, or subjected to any other arrest procedures.

A detective, Dennis Maggio, came into the interview room, where he and the defendant sat alone. The detective testified that he gave the defendant *Miranda* warnings and began to question him. After approximately 10 minutes of questioning, the defendant made an incriminating statement regarding an assault of a minor boy in Streamwood. Based on this, the detective considered there was probable cause to arrest the defendant and he placed the defendant under arrest and repeated the *Miranda* warnings. After this second set of warnings was given, the defendant made incriminating statements concerning the sexual attack of the three girls in Barrington.

A short time after Detective Maggio's interview, two officers from Barrington came to question the defendant. According to one of them, the defendant made incriminating statements regarding the Barrington incident. None of these statements was recorded or reduced to writing, and the defendant denied making any incriminating statements.

The defendant was brought to trial before a jury in the Barrington case (No. 67290). The trial court closed the trial to the public while the child victims testified. The judge allowed the victims' family members, a psychologist, and members of the media to remain in the courtroom while all others were directed to leave. In making this decision, the trial judge considered the age

of the victims, the psychological impact on the child witnesses, the nature of the case, the interests of the victims' families, and the rights and interests of the defendant.

The victims, their mothers, and the interviewing officer testified to the details of the victims' complaints. There, J.L.'s, J.W.'s, and J.B.'s testimony included descriptions of the assailant, the car, and the acts of deviate sexual assault. The mothers and the officer were allowed to repeat the detailed information given by the children in addition to the fact that a complaint was made.

The defendant argued that testimony of an adult baby-sitter as to the meaning of the term "stranger danger" invaded the province of the jury. The court allowed the baby-sitter, the one to whom the children first complained of the sexual conduct, to testify concerning her knowledge of the expression "stranger danger." The baby-sitter, based on her own personal knowledge, explained that the child protection program includes a visit by a police officer, identified as "Officer Friendly," and is intended to instill in the children knowledge that the police officer is their friend. Any person whom the children do not know is a stranger, while people who were not "nice" were referred to as "stranger danger."

Further, in the Barrington case, the trial court allowed J.B. and her mother to testify to J.B.'s identification of the "stranger danger" in a newspaper. J.B. testified at the trial that the assailant had curly hair and a moustache and that she had seen a picture of the "stranger danger" in a newspaper that was on her kitchen table. J.B. was shown the picture in court and identified a man in the picture as resembling the man who had been in the car. The man in the picture was the defendant. Both J.B. and her mother were cross-examined.

After a verdict of guilty on all charges at the trial, the defendant was sentenced to 25 years' incarceration for deviate sexual assault and 3 years' incarceration, to be served concurrently, for unlawful restraint.

Following a bench trial in the Streamwood case, the defendant was found guilty of one count of deviate sexual assault and two counts of aggravated indecent liberties with a child. In light of the prior convictions, the defendant was sentenced to a statutory extended sentence for a brutal and heinous crime of 45 years to run concurrently with the 25-year sentence.

The appellate court reversed the convictions and remanded for a new trial. The court held that the stop of the defendant's car constituted a warrantless arrest without probable cause. (171 Ill. App. 3d at 48.) Too, the court adjudged that detention of the defendant for interrogation was without probable cause and violated the defendant's fourth amendment rights. (171 Ill. App. 3d at 49.) The evidence obtained upon questioning the defendant was inadmissible, the court said, and should have been suppressed. Further, the court held that the defendant's right to a public trial was violated when the trial court at the Barrington trial failed to state reasons for the record for closure of the trial. (171 Ill. App. 3d at 51.) The court held too that the trial court erred in admitting certain evidence, which we shall discuss.

The basic question here is whether the defendant was arrested without probable cause and seized in violation of rights under the fourth amendment. The State contends that the officer had sufficient evidence, a license number and the description of the car, to stop and to question the defendant. Further, the State maintains that the subsequent statement given by the defendant was voluntary when, after being given *Miranda* warnings and without being subjected to the procedures of arrest, the defendant made incriminating statements. The

defendant, in his *pro se* brief and in his attorney's, contends that he was arrested without probable cause when he was stopped by the police or, in any event, when he was taken to the interrogation room for questioning. He argues that the stop of the car and his detention by police constituted a seizure under the fourth amendment. We affirm the judgment of the appellate court that the defendant was arrested without probable cause and was seized in violation of rights under the fourth amendment.

A warrantless arrest by a peace officer may be valid when "[h]e has reasonable grounds to believe that the person is committing or has committed an offense." (Ill. Rev. Stat. 1987, ch. 38, par. 107—2(1)(c).) This court has held the "reasonable grounds" standard synonymous with probable cause. (*People v. Wright* (1985), 111 Ill. 2d 128, 145, citing *People v. Tisler* (1984), 103 Ill. 2d 226, 236-37.) To determine whether an arrest has occurred, courts have considered a number of factors: whether a reasonable person, innocent of any crime, would have considered himself arrested or free to leave (*Michigan v. Chesternut* (1988), 486 U.S. 567, 573, 100 L. Ed. 2d 565, 571-72, 108 S. Ct. 1975, 1979; see also *Dunaway v. New York* (1979), 442 U.S. 200, 208 n.6, 60 L. Ed. 2d 824, 832 n.6, 99 S. Ct. 2248, 2253 n.6; *People v. Lucas* (1989), 132 Ill. 2d 399, 417-18; *People v. Reynolds* (1983), 94 Ill. 2d 160, 165); "[t]he intent of the officer and the understanding of the arrestee" (*People v. Sanders* (1981), 103 Ill. App. 3d 700, 709); and whether the defendant was told he was free to leave or that he was under arrest (*People v. Townes* (1981), 94 Ill. App. 3d 850, 853).

While the police, under the circumstances, clearly had the right to question the defendant (*United States v. Mendenhall* (1980), 446 U.S. 544, 553, 64 L. Ed. 2d 497, 508, 100 S. Ct. 1870, 1876-77; *People v. Wipfler* (1977), 68 Ill. 2d 158, 168), the evidence shows the defendant

was arrested without probable cause upon the stopping of his car and the attendant events. The evidence shows that the defendant was directed to pull over by a police officer while a second car, flashing its Mars lights, pulled up. Two uniformed officers approached the defendant and, though no prolonged questioning occurred, one officer asked to see his driver's license. The defendant was asked to go to the police station "to get a matter cleared up." The defendant stated that the officer told him he would have to go to the station to retrieve his license; he felt compelled to go to the station. He was not told that he was free to go, that he could come to the station at a later time, or that he was under arrest. Though the defendant was allowed to drive his own car, Officer Buschbacher testified that one police car preceded and one police car followed the defendant's car to the station. Once the defendant reached the station, he was directed where to park, and when he got out of his car, an officer either led him into the station or followed him. The defendant was directed to sit in an interrogation room where an officer kept him under observation. The defendant testified that he felt he was not free to leave. We judge that, under the totality of the circumstances, a reasonable person, innocent of a crime, would have considered himself under arrest.

The defendant contends too that the stopping and detention of his car constituted a seizure under the fourth amendment (U.S. Const., amend. IV). The Supreme Court has held that the fourth amendment's requirement that all searches and seizures be reasonable applies to situations including " 'seizures that involve only a brief detention short of a traditional arrest. [Citations.]' " (*United States v. Mendenhall* (1980), 446 U.S. 544, 551, 64 L. Ed. 2d 497, 507, 100 S. Ct. 1870, 1875; see also *Davis v. Mississippi* (1969), 394 U.S. 721, 726-27, 22 L. Ed. 2d 676, 681, 89 S. Ct. 1394, 1397; *Terry v. Ohio*

(1968), 392 U.S. 1, 19, 20 L. Ed. 2d 889, 904, 88 S. Ct. 1868, 1879.) The Court emphasized that a person is seized within the meaning of the fourth amendment when, by a show of authority or use of physical force, his freedom of movement is restrained. (*Mendenhall*, 446 U.S. at 553-54, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877.) A seizure occurs "whenever a police officer accosts an individual and restrains his freedom to walk away." *Terry*, 392 U.S. at 16, 20 L. Ed. 2d at 903, 88 S. Ct. at 1877; see also *Mendenhall*, 446 U.S. at 554, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877; *People v. Long* (1983), 99 Ill. 2d 219, 229.

As stated earlier, the record reflects that the show of authority by the officers in pulling over the defendant and in guarding the interrogation room justified the defendant's belief that he was not free to leave. The defendant was seized in violation of the fourth amendment.

The defendant contends that, if we find there was a seizure under the fourth amendment, any incriminating statements made to Detective Maggio should be suppressed as a product of the illegal arrest and seizure. In *Wong Sun v. United States* (1963), 371 U.S. 471, 488, 9 L. Ed. 2d 441, 455, 83 S. Ct. 407, 417, the Court held that the "more apt question *** is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' [Citation.]" Further, in *Brown v. Illinois*, the Court identified several factors that would assist in the determination of whether a confession or incrimination is obtained in exploitation of an illegal arrest. (*Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254.) The Court held that the " 'temporal proximity of the arrest and the confession, the presence of interven-

ing circumstances, ... and, particularly, the purpose and flagrancy of official misconduct' " must be considered. Further, the giving of *Miranda* warnings is a factor. (*Dunaway*, 442 U.S. at 218, 60 L. Ed. 2d at 839, 99 S. Ct. at 2259, quoting *Brown*, 422 U.S. at 603-04, 45 L. Ed. 2d at 427, 95 S. Ct. at 2261-62; see also *People v. White* (1987), 117 Ill. 2d 194, 223.) When these factors are considered, it is clear that the incriminating statements made by the defendant should be suppressed.

Here, the defendant was taken directly to the police station from a roadside stop that lacked probable cause. At the station, the defendant was directed to an interrogation room, and after being seated and while under police guard, the defendant was questioned by Detective Maggio. Maggio gave the *Miranda* warnings and began questioning the defendant though, at the time of questioning, the defendant was not a suspect. Approximately 10 minutes into the interrogation, the defendant made incriminating statements and was placed under formal arrest.

The State maintains that the giving of *Miranda* warnings purged any taint of an illegal arrest. The giving of *Miranda* warnings alone is not sufficient to purge the taint of an illegal arrest. (*Brown v. Illinois* (1975), 422 U.S. 590, 603, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2261.) This court held in *People v. Franklin* (1987), 115 Ill. 2d 328, 333, that, though the defendant was given *Miranda* warnings before he confessed, "voluntariness of a defendant's statements does not automatically purge the taint of an illegal arrest and detention." The State's argument is unpersuasive.

The State also argues that the defendant's statements are admissible under the inevitable-discovery doctrine. The State attempts to argue this theory for the first time before this court. "This court has long held that an issue not raised in the trial court is considered

waived." (*People v. Adams* (1989), 131 Ill. 2d 387, 395.) The State waived the inevitable-discovery contention.

The State contends that the court's closure of the trial in the Barrington case during the victims' testimony was correct under section 115—11 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 115—11). Section 115—11 provides:

> "[W]here the alleged victim of the offense is a minor under 13 years of age, the court may exclude from the proceedings while the victim is testifying, all persons, who, in the opinion of the court, do not have a direct interest in the case, except the media." (Ill. Rev. Stat. 1985, ch. 38, par. 115—11.)

The State maintains that the judge provided sufficient grounds on the record for closure. Too, the State argues that the presumption of an open, public trial in a criminal case may be overcome by overriding interests. Further, the State contends that the statute is constitutional because it is narrow in its scope, and it gives the judge discretion to close the trial. The defendant counters that, not only was the closure not justified, the statute (Ill. Rev. Stat. 1985, ch. 38, par. 115—11) is unconstitutional because the statute is overbroad and denies the defendant the sixth amendment right to a public trial. The appellate court held that the trial judge improperly involved the statute. The court held the closure was incorrect because there was insufficient evidence on the record that the trial judge balanced the victims' rights against the defendant's sixth amendment right to a public trial. The appellate court, citing *Globe Newspaper Co. v. Superior Court* (1982), 457 U.S. 596, 607-08, 73 L. Ed. 2d 248, 258, 102 S. Ct. 2613, 2620-21, held that the following factors should be considered in determining whether closure was proper: "the age, psychological maturity and understanding of a minor witness, the type of

crime at issue, and the wishes of the victim and the victim's family." 171 Ill. App. 3d at 50-51.

The right of access to criminal trials is not absolute. (*Richmond Newspapers, Inc. v. Virginia* (1980), 448 U.S. 555, 581, 65 L. Ed. 2d 973, 992, 100 S. Ct. 2814, 2829.) "The central aim of a criminal proceeding must be to try the accused fairly." (*Waller v. Georgia* (1984), 467 U.S. 39, 46, 81 L. Ed. 2d 31, 38, 104 S. Ct. 2210, 2215.) In addition to overseeing, in a sense, the judge and prosecutor to ensure they carry out their duties responsibly, "a public trial encourages witnesses to come forward and discourages perjury. [Citations.]" (*Waller*, 467 U.S. at 46, 81 L. Ed. 2d at 38, 104 S. Ct. at 2215.) Finally, the Court in *Waller*, quoting *Press-Enterprise Co. v. Superior Court*, held that while a criminal trial is presumed open, the presumption may be rebutted by " 'an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.' " (*Waller*, 467 U.S. at 45, 81 L. Ed. 2d at 38, 104 S. Ct. at 2215, quoting *Press-Enterprise Co. v. Superior Court* (1984), 464 U.S. 501, 510, 78 L. Ed. 2d 629, 638, 104 S. Ct. 819, 824.) The interest must be sufficiently supported by specific facts so that the reviewing court may determine the propriety of the closure. *Press-Enterprise Co. v. Superior Court* (1984), 464 U.S. 501, 510-11, 78 L. Ed. 2d 629, 639, 104 S. Ct. 819, 824.

Here, the judge in the Barrington trial expressed sufficient reasons to warrant closure of the trial. Though the judge did not make a formal declaration of the reasons, the record clearly shows the reasons for closure. An examination of the record demonstrates that the trial judge balanced the interests and factors in the case.

In deciding the motion for closure, the judge based his decision on the effects on a young child of testifying while a large number of people were in the courtroom. In answer to the defendant's argument that, by allowing

only the members of the family and other interested parties to be in the courtroom, the public was thus excluded in violation of the defendant's sixth amendment right to a public trial, the judge said that the fact that the media were present actually allowed public presence. There is no evidence that the jury was misled or prejudiced by the decision because the judge informed the jury why the courtroom was closed. Further, when the jury was originally seated, the judge explained that the spectators would be cleared from the courtroom because of the age of the witnesses. During the trial, the judge allowed the victims' fathers to remain in the courtroom. At a later point in the trial, the prosecutor asked the judge if a psychologist could remain in the courtroom during the testimony of the child in an effort "to prevent any possibility of any sort of emotional disturbance as far as the mental health of this young lady who is about to testify." After weighing the interests of the defendant and the witness, cautioning the counselor not to make any comments during the trial, and receiving the consent of the defendant's counsel, the judge allowed the counselor to sit in the courtroom. It was at this point that the judge made the statement relied upon by the appellate court. The reason for closure given was that "it would have an unnerving effect on the children if the courtroom was crowded," "it is a very sensitive case," and "I [the judge] want to make this unpleasant experience as pleasant as possible for these children."

It is clear from the record that the judge considered the interests of both the defendant and the minor witnesses. By allowing the media to attend, the judge preserved the defendant's sixth amendment right to a public trial. The trial judge considered that the media presence is, in effect, the presence of the public. Too, the judge did not allow persons without an interest to attend. The judge explained that the age of the witnesses,

their psychological immaturity, the nature of the case, and the wishes of the victim contributed to his decision. Each of these factors was cited by the appellate court as being determinative of the propriety of the closure of a trial. Therefore, the appellate court erred in holding that the trial judge improperly closed the public trial.

The defendant also argues that the statute is unconstitutional because it gives the trial judge discretion to close the trial, it denies the defendant his right to a public trial, and the statute, if intended to protect minors from publicity, is undermined by allowing the media to be present. The defendant's arguments are unpersuasive.

Complete mandatory closure provisions have been held violative of the first amendment. (*Globe Newspaper Co. v. Superior Court* (1982), 457 U.S. 596, 73 L. Ed. 2d 248, 102 S. Ct. 2613; *Richmond Newspapers, Inc. v. Virginia* (1980), 448 U.S. 555, 65 L. Ed. 2d 973, 100 S. Ct. 2814.) The presumption for an open court may be overcome by overriding interests to preserve higher values and must be narrowly tailored to serve that purpose. (*Press-Enterprise Co. v. Superior Court* (1984), 464 U.S. 501, 78 L. Ed. 2d 629, 104 S. Ct. 819.) The judge's discretion must be "no broader than necessary to protect [the interest in closure]." *Waller v. Georgia* (1984), 467 U.S. 39, 48, 81 L. Ed. 2d 31, 39, 104 S. Ct. 2210, 2216.

Section 115—11 provides:

> "[W]here the alleged victim of the offense is a minor under 13 years of age, the court *may* exclude from the proceedings while the victim is testifying, all persons, who, *in the opinion of the court*, do not have a direct interest in the case, except the media." (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 38, par. 115—11.)

The statute provides that the judge may use his discretion in connection with the exclusion of those persons who, in his opinion, are not directly interested in the

case. Unlike the statute in *Globe Newspaper Co. v. Superior Court* (1982), 457 U.S. 596, 73 L. Ed. 2d 248, 102 S. Ct. 2613 (statute excluded the press and the general public), our statute is limited to discretionary closure in a criminal trial and does not allow the media to be excluded. Too, the statute provides guidelines to ensure that the judge does not overstep the authority conferred. The statute provides that closure can be effected only in the narrow instance when a minor is testifying and it will be limited to the time when the child is testifying. The trial court properly involved section 115—11, which does not violate the constitutions.

The State next argues that the appellate court erred when it held that the trial court improperly allowed witnesses to testify in extensive detail concerning the descriptions and conversations with the victims. In the Barrington jury trial, the three minor girls, their mothers, and the officer that interviewed J.B. and J.W. were allowed to relate the details of the girls' complaints to them. Each of the victims testified and was cross-examined. In the Streamwood trial, the victim's mother was permitted to testify what her son had told her of the incident, including that the offender had curly brown hair and a moustache. The appellate court held that section 115—10 of the Code of Criminal Procedure (Ill. Rev. Stat. 1985, ch. 38, par. 115—10) permits witnesses other than the victim to testify only that a complaint has been made. The court held that the admission of the details of the complaints constituted reversible error. (171 Ill. App. 3d at 51.) The State maintains that the details of the complaints fall within the corroborative complaint statutory exception to the hearsay rule. In the alternative, the State argues that, if admission of the facts of the complaints was error, the error was harmless due to the substantial evidence in corroboration of the complaint

coupled with the availability of the witnesses and the victims for cross-examination.

Section 115—10 provides:

> "In a prosecution for a sexual act perpetrated upon a child under the age of 13, \*\*\* the following evidence shall be admitted as an exception to the hearsay rule:
>
> (1) testimony by such child that he or she complained of such act to another; and
>
> (2) testimony by the person to whom the child complained that such complaint was made in order to corroborate the child's testimony." (Ill. Rev. Stat. 1985, ch. 38, par. 115—10.)

There have been decisions which have regarded as harmless error the permitting of testimony beyond the victim's complaint of the crime to the witness. Considering the circumstances here we cannot, however, regard the prejudicial testimony as harmless error.

The defendant, in his *pro se* brief and through his attorney's brief, further argues that the out-of-court identification by J.B. from the newspaper's photograph should not have been admitted absent an in-court identification by J.B. The State maintains that section 115—12 of the Code of Criminal Procedure (Ill. Rev. Stat. 1987, ch. 38, par. 115—12) makes an in-court identification to corroborate an out-of-court identification unnecessary. The appellate court held that, under the plain language of the statute, an in-court identification is no longer required.

Section 115—12 provides:

> "Substantive Admissibility of Prior Identification. A statement is not rendered inadmissible by the hearsay rule if (a) the declarant testifies at the trial or hearing, and (b) the declarant is subject to cross-examination concerning the statement, and (c) the statement is one of identification of a person made after perceiving him."

Here, J.B. testified at both the suppression hearing and at the trial. She was cross-examined about her identifica-

tion of the defendant and she identified the man in the newspaper picture as the "stranger danger." Too, J.B.'s mother testified that J.B. looked at the picture that appeared in the newspaper, pointed to the man in the picture, and stated that the man was the "stranger danger." The elements to section 115—12 were satisfied, and the out-of-court identification was properly admitted.

Prior to this statute's enactment, this court, in *People v. Rogers* (1980), 81 Ill. 2d 571, 580-81, held that prior identification evidence, in order to be admissible, must corroborate an in-court identification of the defendant. As one appellate court decision held, section 115—12 represents a legislative response to *Rogers. People v. Davis* (1985), 137 Ill. App. 3d 769, 771.

The defendant contends that, when the trial court allowed the adult baby-sitter to explain the origin of the phrase "stranger danger," it committed reversible error. The State counters that this issue was waived by the defendant when he did not challenge the testimony on the grounds that it invaded the fact-finding province of the jury. In the alternative, the State maintains that the baby-sitter merely stated her personal knowledge of the origin of the phrase "stranger danger." The appellate court held that the testimony was a factual question, and therefore admissible.

Where a statement is made before the jury by a second witness who testifies as to his opinion of the meaning of the testimony given by the first witness, the second witness' testimony is said to usurp the function of the jury. (*People v. Linkogle* (1977), 54 Ill. App. 3d 830, 833.) The court held that the statements of a witness must be supported by personal knowledge (*Linkogle*, 54 Ill. App. 3d at 833, citing *People v. Rosenbaum* (1921), 299 Ill. 93), and "a witness may not state his opinion or

conclusion concerning [another's] out-of-court statement" (*Linkogle*, 54 Ill. App. 3d at 833).

Here, the baby-sitter did not give her opinion of the meaning of the phrase "stranger danger." The witness simply explained to the jury, based on her personal knowledge, the program behind the expression. She testified that the program included lectures by a police officer, "Officer Friendly," and that the program was intended to make the children aware that the police were their friends. The baby-sitter testified that, over the years, her children had brought home the phrase "stranger danger," and that she routinely explained to the children that they should not talk to strangers.

The jury was able to make any inferences that it wanted to in interpreting the children's testimony and the testimony of the baby-sitter. Unlike the facts in *People v. Linkogle*, where the mother's statements left no room for inference, the testimony here did not invade the province of the jury. The testimony of the baby-sitter was properly admitted.

In view of the disposition we make in this cause, we do not consider the defendant's contentions regarding the sentences imposed.

For the reasons given, the appellate court's judgments are affirmed.

*Judgments affirmed.*

JUSTICE STAMOS took no part in the consideration or decision of this case.